398 Mass. 480 (1986)
498 N.E.2d 1044
PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., & another[1]
vs.
PROBLEM PREGNANCY OF WORCESTER, INC.
Supreme Judicial Court of Massachusetts, Middlesex.
April 9, 1986.
October 16, 1986.
Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.
John W. Spillane for the defendant.
John H. Henn (Nancy R. Gottlieb with him) for the plaintiffs.
NOLAN, J.
In this case, we consider a number of issues arising out of a dispute between the defendant, Problem Pregnancy of Worcester, Inc., an organization which advocates alternatives to abortion, and the plaintiffs, Planned Parenthood Federation of America, Inc., and Planned Parenthood League of Massachusetts, Inc. The dispute is over the defendant's use of the initials "PP" on the front door to its office which is located on the same floor of the building in which the Planned Parenthood League of Massachusetts, Inc., is located. The complaint alleges numerous statutory infringement claims, a common law service mark violation, and unfair and deceptive acts under G.L.c. 93A (1984 ed.).
After reviewing the record and the judge's findings, we learn that Planned Parenthood Federation of America, Inc. (PPFA), is a nonprofit corporation and maintains approximately 190 clinics across the country which provide medical and educational services, in the area of birth control and abortion. PPFA has registered with the United States Patent and Trademark Office two service marks. One is the name "Planned Parenthood," and the other service mark is "PP," with one "P" enclosing the other. The latter service mark was registered in 1983.[2]
Planned Parenthood League of Massachusetts, Inc. (PPLM), was incorporated as a charitable corporation pursuant to G.L.c. 180 (1984 ed.) in 1979. The clinic for abortions, located *482 on the sixth floor of a building at 340 Main Street in Worcester, opened its doors in December, 1982. Approximately one month after PPLM opened, Problem Pregnancy of Worcester, Inc. (PP, Inc.), a nonprofit charitable corporation offering counseling for alternatives to abortion, rented office space on the same floor as PPLM. The judge found that it was the desire of PP, Inc.'s incorporators, principally members of Central Massachusetts Citizens for Life, to be located as close as possible to PPLM in order to provide alternatives to abortion. Because of the location of these two organizations, the judge also found that persons using the main entrance to 340 Main Street and the elevators would have to pass PP, Inc. on their way to PPLM.
PP, Inc. posted a sign on its door reading "PP" followed by smaller letters, "Inc. of Worc." Placed below that sign were the words: "Free pregnancy testing and counseling, walk-in." The office number, handwritten on a small white card, was located in the upper right hand corner of the door. Approximately one foot from the bottom of the door was the full title "Problem Pregnancy of Worcester, Inc.," in letters measuring about one-half inch.
According to the affidavits of three women, on separate occasions, each entered 340 Main Street on her way to have either a pregnancy test or an abortion at PPLM and by mistake entered the offices of PP, Inc. There the women conversed with staff members and filled out medical history forms before realizing they were at the wrong place. They were distressed over this confusion and complained to PPLM. Their claims triggered the present action.
On March 2, 1984, PPLM sought a preliminary injunction in an effort to enjoin PP, Inc. from utilizing the initials "PP" on the door. It was denied. A single justice of the Appeals Court dismissed the appeal from that denial on the condition that PP, Inc. affix a crucifix to its door. PP, Inc. complied. Additionally, a complaint was brought by PPLM against the landlords of 340 Main Street for breach of covenant of quiet enjoyment of the common corridors of the building. A judge issued a preliminary injunction against the landlords ordering them to prevent the diversion of PPLM's clients on their way to the abortion clinic.
*483 The landlords then sought to evict PP, Inc. from the building pursuant to G.L.c. 186, § 12 (1984 ed.), and a jury found in their favor in a summary process action. PP, Inc. appealed to this court in that case on several tangential issues and we affirmed the judgment. Ingram v. Problem Pregnancy of Worcester, Inc., 396 Mass. 720 (1986). Therefore, PP, Inc., if it has not done so to this date, will be vacating the premises at 340 Main Street.
PPLM next filed the instant complaint claiming common law service mark infringement against PP, Inc., asserting two State statutory claims, G.L.c. 159, § 9 (1984 ed.), and G.L.c. 110B, § 12 (1984 ed.), and two Federal claims, 15 U.S.C. §§ 1114(1)(a) and 1125(a) (1982). PPLM sought to enjoin PP, Inc. from using the initials "PP" in any way because in doing so, PP, Inc. infringes upon PPLM's trade name, dilutes the quality of PPLM's trade name, injures its business reputation, and misrepresents itself as an affiliate of PPLM and PPFA. Additionally, PPLM included a count under G.L.c. 93A, §§ 2, 11, claiming that PP, Inc.'s use of the letters "PP" on its door constituted an unfair and deceptive business practice.
The judge found that "the letters `PP' on the door of Problem Pregnancy caused confusion to each of [the three women who testified at trial] and by inference draws the conclusion that those letters are causing confusion to other prospective clients of PPLM." He stated that "none of the women who entered the Problem Pregnancy office was harassed and that each was treated with courtesy and dignity." The judge also found "no showing that the actions of any of the employees of Problem Pregnancy caused any damage to PPLM." He did find that the women were uncomfortable with their errors and that it was PP, Inc.'s intent to confuse women in order to effectuate its purpose. He issued a permanent injunction whereby Problem Pregnancy was enjoined "from using the letters PP or PP, Inc. or any similar combinations of the initials resembling PPLM or PPFA or Planned Parenthood on its door or on any of its advertising, literature, letterheads or similar advertising material." He also awarded attorney's fees and costs. PP, Inc. has appealed from this judgment.
*484 We begin our discussion by reiterating the familiar standard of review of a trial judge's findings. "Findings of fact shall not be set aside unless clearly erroneous...." Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). This court must also examine the findings and rulings to make sure that the conclusions are not inconsistent with legal standards. Marlow v. New Bedford, 369 Mass. 501, 508 (1976).
1. Service mark infringement. The judge ruled that "[t]he use by Problem Pregnancy of the letters PP on its door creates a reasonable probability that the public will be deceived into thinking it is dealing with PPLM when it is in fact dealing with Problem Pregnancy. As such, the use of the PP sign should be enjoined." He cited G.L.c. 110B, § 12,[3] and G.L.c. 155, § 9,[4] and also ruled that the use of the letters PP was an intentional infringement of PPFA's registered service *485 marks under 15 U.S.C. § 1114 (1982).[5] In addition the judge ruled that the service marks had acquired a "secondary meaning" under the common law and, therefore, were protected service marks. We agree with the judge's ruling that the use of the letters "PP" constitutes a common law service mark infringement,[6] and affirm the grant of the injunction.
"Under the common law of this Commonwealth one whose trade name has acquired a secondary meaning in the minds of the public as indicating the origin of his products or as identifying his goods known to them by a trade name has the right to have his trade name protected by securing an injunction to prevent another from using the same name or a name so similar as to mislead the public into buying the defendant's goods in the belief that they were buying those of the plaintiff and from palming off his goods as those of the plaintiff to the injury of the latter." Monroe Stationers & Printers, Inc. v. Munroe Stationers, Inc., 332 Mass. 278, 280 (1955).
Secondary meaning has been described as follows: "[I]f a given symbol or word is not inherently distinctive, it can be registered or protected as a mark only upon proof that it has become distinctive. This acquisition of distinctiveness is referred to as `secondary meaning'" (emphasis in original). 1 J.T. *486 McCarthy, Trademarks and Unfair Competition § 15:1 (A) (2d ed. 1984). "The prime element of secondary meaning is a mental association in the buyers' minds between the alleged mark and a single source of the product" (emphasis in original). Id. at § 15:2. Whether secondary meaning has been acquired is a question of fact, Professional Economics, Inc. v. Professional Economic Servs., Inc., 12 Mass. App. Ct. 70, 75 (1981), and the burden of proof is on the party attempting to establish protection for the mark. See Petersen Mfg. Co. v. Central Purchasing, Inc., 740 F.2d 1541, 1549 (Fed. Cir.1984).
This court and others have looked at a variety of factors in determining whether words or symbols have acquired secondary meaning, which include the length of use of the mark, similarity of marks, similarity of goods, relationship between the two organizations, classes of prospective purchasers, strength of mark, and evidence of actual confusion. See, e.g., S.M. Spencer Mfg. Co. v. Spencer, 319 Mass. 331 (1946); Professional Economics, Inc., supra at 73-79; Roto-Rooter Corp. v. O'Neal, 513 F.2d 44, 45 (5th Cir.1975). We analyze these factors in the present case.
Planned Parenthood Federation of America has been using the name "Planned Parenthood" since 1935. The initials "PP" have been used by the corporation since September, 1980. We note that the current service mark "PP" (one P enclosed inside another) was not registered until 1983. However, registration is not a requirement under common law in order to acquire a protected trademark, but instead is evidence of secondary meaning. See Monroe Stationers & Printers, Inc., supra; Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 203 (2d Cir.1979).
Long and exclusive use of words by the first user can help establish secondary meaning. "[T]here is no rule as to the length of time required. It must be governed by the conditions in each case, depending on the locality, the nature of the business, and the kind of goods involved, and the use to which the name has been put by plaintiff." Professional Economics, Inc. v. Professional Economic Servs., Inc., supra at 76, quoting 1 H.D. Nims, Unfair Competition and Trade-Marks § 38a *487 (4th ed. 1947). The evidence presented, indicating that PPFA was using the initials "PP" on its brochures, pamphlets, and vehicle bumper stickers, and that PPFA referred to its many affiliates by using the letters "PP" over the past several years, and the fact that PPLM opened its abortion clinic in Worcester in 1982 and distributed brochures throughout the Worcester area before opening, satisfies the length of use requirement. See Great Scott Food Mkt., Inc. v. Sunderland Wonder Inc., 348 Mass. 320, 323-324 (1965). We disagree with the defendant's assertion that PPLM may not adopt the stylized service mark or abbreviated name as registered by PPFA. PPFA maintains its headquarters in New York, and there are approximately 190 Planned Parenthood clinics in the country. They are all "Planned Parenthood" clinics and as such PPLM is included under the umbrella of the servicemark "PP," as created by PPFA, and subsequently adopted by PPLM. The judge found, and we find ample support for his finding in the record,[7] that "PPFA has a number of affiliate organizations in the United States. An organization is authorized to become an affiliate of PPFA upon vote of PPFA's Board of Directors. In order to become an affiliate of PPFA an organization must agree to certain standards and policies which are contained in the by-laws of PPFA."[8] Moreover, in 1984 PPFA sent a letter to PP, Inc. on behalf of PPLM demanding that "PP, Inc." be removed from its door. The judge also found that PPLM uses the two service marks of PPFA on its advertising material as well as "PPLM."[9] Therefore, we find no clear error in the judge's *488 finding of secondary meaning as it was clearly established that the initials "PP" were strongly associated with the organization Planned Parenthood in the public eye.
The mark in question is a stylized logo using the two letters "PP." The defendant uses as its abbreviated name "PP, Inc.," and added "of Worc." after the commencement of this suit. We hold that the degree of similarity is high. Compare Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1183 (11th Cir.), cert. denied, 474 U.S. 844 (1985) (primary word was weak and logos were different). Both corporations have in common pregnancy testing and counseling services for pregnant women. The so-called services are similar, as are the prospective clients. The mark is strong because the initials "PP" can easily be construed as signifying "Planned Parenthood." See Armco, Inc. v. Armco Burglar Alarm Co., 693 F.2d 1155, 1159-1160 (5th Cir.1982) (mark was strong where court found it to be an "arbitrary" or "distinctive" mark rather than "suggestive" or "descriptive"). These factors of similarity of mark, strength of mark, and similarity of services are important in establishing the second element of trademark or service mark infringement which is the element of likelihood of confusion.
There was evidence and the judge found that PP, Inc., although not with malicious intent, did very little to remove the confusion of women who entered its premises to have an abortion assuming they were at PPLM, and that it was "the intent of Problem Pregnancy to utilize the letters of `PP' on the door in order to confuse women to enter their office in order to have an opportunity to present information to these women relative to alternatives to abortion." PP, Inc. obtained medical history forms from the women, and counseled them against having an abortion and on two occasions requested that the women view a film. "Potential damage which may result from confusion *489 between the parties' names has been deemed to be irreparable injury warranting injunctive relief since a party's reputation and good will may be threatened." Christian Science Bd. of Directors v. Evans, 191 N.J. Super. 411, 423 (1983).
Although the confusion referred to in unfair competition claims has generally meant confusion as to source or origin of goods or services, the trend has been to extend confusion to the factors of sponsorship or endorsement. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 769 (1986). "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." (Citations omitted.) Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-205 (2d Cir.1979). The danger here is the fact that the two organizations, located on the same floor of the same building, operate for diametrically opposing purposes and that PP, Inc. confused the public into believing that its services were endorsed by PPLM.
The plaintiff need only show a likelihood of confusion in order to be entitled to equitable relief.[10] See Warner Bros. v. Gay Toys, Inc., 658 F.2d 76, 79 (2d Cir.1981). However, actual confusion, which is present in this case, is the best evidence of likelihood of confusion. Roto-Rooter Corp. v. O'Neal, 513 F.2d 44, 46 (5th Cir.1975).
In order to determine whether the judge was clearly in error, we have reviewed the testimony of three women who testified at trial under pseudonyms about their experiences at Problem Pregnancy.[11] Mary Moe, Susan Roe, and Jane Doe stated *490 that, on separate occasions, each entered 340 Main Street and took an elevator to the sixth floor. Each woman saw signs for Planned Parenthood and proceeded down the corridor toward the clinic. They then saw the door with the name "PP, Inc." and thinking that "PP" stood for Planned Parenthood, they entered the office of Problem Pregnancy. They completed medical history forms and were counseled about alternatives to abortion before realizing that they were not at Planned Parenthood. Two of the women viewed at least a portion of a film; one woman was refused directions to Planned Parenthood. PPLM also presented evidence that it received a bill for a newspaper advertisement Placed by Problem Pregnancy. The evidence was more than sufficient to support the judge's finding on the element of confusion.
2. Chapter 93A claim. The judge awarded attorney's fees and costs, but no damages, on the plaintiffs' claim for unfair and deceptive business practices under G.L.c. 93A, § 11 (1984 ed.). PP, Inc. contends on appeal that charitable corporations are immune from liability under G.L.c. 93A, § 11, because they are not engaging in a "trade" or "commerce." Moreover, PP, Inc. argues that PPLM has not proved any "money" or "property" loss as is required under § 11.
Notwithstanding the abolition of common law charitable immunity in this Commonwealth, PP, Inc.'s contention is not totally without merit. G.L.c. 231, § 85K (1984 ed.). General Laws c. 93A, § 11, provides in part: "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property ... as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice ... may bring an action...." "Trade" and "commerce," as defined in § 1 (b), include "the advertising, the offering for sale, rent or lease, the sale, rent, lease or *491 distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." Chapter 93A "is not available where the transaction is strictly private in nature, and is in no way undertaken in the ordinary course of a trade or business." Lantner v. Carson, 374 Mass. 606, 608 (1978).
Chapter 93A is a "statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). Section 3 enumerates the exceptions to c. 93A,[12] none of which applies to the defendant. The issue whether a corporation such as PP, Inc. is subject to liability under c. 93A has never been addressed by this court. Although in other c. 93A cases we have discussed the definition of the terms "trade" and "commerce" none of the cases involved charges of unfair competition. Instead, the actions complained of were committed in the form of a transaction between two persons or corporations. The issue in those cases was whether the particular transaction was "undertaken in the ordinary course of a trade or business." Lantner v. Carson, supra. It is important to mention the major cases although we recognize that most are distinguishable on the facts from the case before us.
In Begelfer v. Najarian, 381 Mass. 177, 190-191 (1980), we delineated certain standards to be applied for determining whether two parties to a transaction were engaged in trade or commerce. Such factors to be considered include: (1) the nature of the transaction, (2) the character of the parties, (3) the activities participated in, and (4) whether the transaction was motivated by business or personal reasons. We held in Begelfer *492 v. Najarian, supra at 189-191, that the defendants were not persons engaged in trade or commerce under § 11 where they had minimal participation in a real estate transaction underlying a loan; they had no input into its negotiation, and were not active in the management of the loan. In Lantner v. Carson, supra, we held that c. 93A did not reach a strictly private transaction such as the sale of a private home. Compare Guenard v. Burke, 387 Mass. 802, 809-811 (1982) (practice of law constitutes trade or commerce under c. 93A), and Commonwealth v. DeCotis, 366 Mass. 234, 239 (1974) (leasing of lots for mobile homes is "trade" or "commerce"), with Manning v. Zuckerman, 388 Mass. 8, 11 (1983) (c. 93A not applicable if unfair and deceptive acts occur in context of parties' employment relationship), Nei v. Burley, 388 Mass. 307, 317-318 (1983) (sellers who played minor role in sale of lots and who did not devote "any appreciable part of his or her time to the real estate" were not engaged in trade or commerce), and Gannett v. Lowell, 16 Mass. App. Ct. 325, 328 (1983) (act committed during the administration of an estate not trade or commerce which "directly or indirectly affects the people of this commonwealth").
"The Legislature originally enacted c. 93A to improve the commercial relationship between consumers and businessmen. By requiring proper disclosure of relevant information and proscribing unfair or deceptive acts or practices, the Legislature strove to encourage more equitable behavior in the marketplace" (emphasis added). Manning v. Zuckerman, supra at 12. The subsequent addition of § 11 extended coverage to individuals engaged in trade or commerce in business transactions with others engaged in trade or commerce. Id.
What we have in this case is an organization which became incorporated under G.L.c. 180.[13] PP, Inc.'s status as a "charitable" *493 corporation is not, in and of itself, dispositive of the issue whether c. 93A applies. Instead we need to look at the particular circumstances to determine whether the acts complained of were committed within a "business context." Begelfer v. Najarian, supra at 190. The Legislature has assisted us in making this determination by defining the words "trade" and "commerce" in G.L.c. 93A, § 1 (b). As we have previously set forth, the definition includes the "sale, rent or lease ... or distribution of any services and any property." The use of the words "distribution of any services" in conjunction with words such as "sale" and "lease" indicates an intent that the services be distributed in exchange for some consideration or that there must be other strong indications that the services are distributed in a business context.
The judge found that PP, Inc. gave "pregnancy tests, pregnancy counseling advice and other services relative to pregnancy in the Worcester area." His findings are not challenged. However, based upon the above finding, the judge ruled that PP, Inc. was subject to liability under G.L.c. 93A. We disagree and hold that he erred in reaching this conclusion.
As a reviewing court, we "must examine the legal standard applied to the facts found in order to assure that the ultimate findings and conclusions below were consistent with statutory norms." Marlow v. New Bedford, 369 Mass. 501, 508 (1976). The judge's sole finding in regard to the nature of PP, Inc.'s activities does not lead to the legal conclusion that PP, Inc. was engaged in the "distribution of services" as contemplated under the statute, pursuant to our discussion in this opinion, and according to our definition of "trade" or "commerce" in past cases. See e.g., Lantner, supra. The evidence would not warrant a finding that PP, Inc. was engaged in trade or commerce. There is little question that the employees of PP, Inc. are motivated in their work to advocate the pro-life position. See Begelfer v. Najarian, supra at 190-191. As found by the *494 trial judge, the "incorporators were principally members of an organization called Central Massachusetts Citizens for Life." Moreover, although the judge made no finding,[14] there was testimony from both sides that PP, Inc. did not charge for its pregnancy tests.
In light of the definitions in § 1 (b) and of the traditional meaning of the words "trade"[15] and "commerce"[16] we conclude that the Legislature intended to exclude the activities engaged in by a corporation such as PP, Inc. from the reaches of c. 93A and that this result is entirely consistent with our cases. We therefore set aside the award of attorney's fees.
3. First Amendment. Finally, we address PP, Inc.'s claim that it is protected by the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights in its use of the initials "PP" on its door. This precise issue has been litigated in other trademark infringement cases. "The [p]laintiff's trademark is in the nature of a property right... and as such it need not `yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist.'" Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 206 (2d Cir.1979), quoting Lloyd Corp. v. Tanner, 407 U.S. 551, 567 (1972). Cf. Fargo Women's Health Org., Inc. v. Larson, 381 N.W.2d 176, 181 (N.D.), cert. denied, 476 U.S. 1108 (1986) (where "pro-life" clinic placed advertisements in commercial context which were directed at the provision of services rather than toward an exchange of ideas, the advertisements were considered commercial speech, and thus not entitled *495 to the "full panoply of First Amendment protections"). The infringement on the plaintiffs' property is more than an intrusion upon privacy. Compare Nyer v. Munoz-Mendoza, 385 Mass. 184, 188 (1982). As in Dallas Cowboys Cheerleaders, Inc., supra, there are numerous ways in which PP, Inc. can advertise and attract clients without infringing on the plaintiffs' service mark.[17] We hold that the judge did not commit an error in granting the injunction. That part of the judgment awarding attorney's fees and costs is reversed. The remainder of the judgment is affirmed.
So ordered.
ABRAMS, J. (concurring in part and dissenting in part, with whom Liacos, J., joins).
I join in parts 1 and 3 of the court's decision. I cannot agree, however, with the court's conclusion in part 2, that, for purposes of G.L.c. 93A, § 11 (1984 ed.), Problem Pregnancy, Inc. (PP, Inc.), is not "engaged in trade or commerce." In deciding whether PP, Inc. has engaged in activities that would subject it to G.L.c. 93A (1984 ed.), the court errs on two levels. First, it fails to apply the plain language of the statute to the findings of the judge below. Second, instead of emphasizing the competitive market relationship between PP, Inc. and the Planned Parenthood League of Massachusetts (PPLM) that was so essential to the holding of part 1, the court shifts its focus in part 2 to PP, Inc.'s transactions with the public. 1, therefore, respectfully dissent.
General Laws c. 93A, § 11, applies to any "person who engages in the conduct of any trade or commerce,"[1] as defined *496 in G.L.c. 93A, § 1 (b) (1984 ed.). This section provides that "trade and commerce" include "the sale, rent, lease or distribution of any services and any property."[2] The judge found that PP, Inc. gave pregnancy tests and counseling, as well as other services relative to pregnancy in the Worcester area. This finding is not challenged and is amply supported by the record. In fact, the testimony of the president of PP, Inc. provides the clearest statement of the company's services. She stated that PP, Inc. works with social service agencies, medical facilities, and religious organizations. Moreover, it is involved with programs that provide housing and nutritional support for pregnant women. Such activities fall within the customary and usual understanding[3] of the words "distribution of services."
The court itself recognizes that both the plaintiff and the defendant corporations are involved in the distribution of services in its resolution of the service mark infringement issue. The court notes the similarity of services provided by PP, Inc. and PPLM when it affirms the conclusion of the lower court that the public is experiencing actual confusion as a result of PP, Inc.'s actions. See ante at 488-490. The court recognizes in part 1 that PP, Inc. offers services; thus, it is hard to understand what error the judge committed in imposing liability under *497 c. 93A. The inconsistency of the court's analysis is striking. Further, the court goes beyond the clear meaning of the words of §§ 1 (b) and 11 to reach a result which is counter to the legislative intent of encouraging "more equitable behavior in the marketplace." Manning v. Zuckerman, 388 Mass. 8, 12 (1983).
In the past, we have looked at the trade or commerce requirement in the context of an unfair or deceptive act or practice. See Begelfer v. Najarian, 381 Mass. 177 (1980); Lantner v. Carson, 374 Mass. 606 (1978); Slaney v. Westwood Auto, Inc., 366 Mass. 688 (1975). This case, however, is different: there was no "transaction" between PP, Inc. and PPLM in which an allegedly unfair or deceptive act occurred, but instead there were unfair and deceptive acts perpetrated on the public and PPLM's clients that amounted to an unfair method of competition against PPLM.[4]
PP, Inc.'s deceptive practices bear a much closer resemblance to the conduct in common law service mark infringement decisions than to the practices thus far analyzed under c. 93A. Compare, e.g., Massachusetts Mut. Life Ins. Co. v. Massachusetts Life Ins. Co., 356 Mass. 287, 293-294 (1969) and Monroe Stationers & Printers, Inc. v. Munroe Stationers, Inc., 332 Mass. 278, 280 (1955), with Lantner, supra, and Begelfer, supra. As recognized by Justice Holmes, "it is pretty well settled that the plaintiff merely on the strength of having been first in the field may put later comers to the trouble of taking such reasonable precautions as are commercially practicable to prevent their lawful names and advertisements from deceitfully diverting the plaintiff's custom." American Waltham Watch Co. v. United States Watch Co., 173 Mass. 85, 87 (1899).[5] PP, Inc. not only failed to take reasonable *498 precautions, it actively sought to divert PPLM's clients. Such unfair conduct clearly falls within the broad prohibitions of c. 93A, a statute which obviously includes common law liabilities as well as many new rights. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986); Slaney, supra at 693; PMP Assocs. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). Although the court recognizes the difference between this case and our past c. 93A decisions, it fails to analyze this case in light of the difference. The court mechanically applies our prior cases to PP, Inc.'s relationship with the public instead of addressing the on-going competition complained of here between PP, Inc. and PPLM.
Ignoring the plain language of the statute, the court utilizes our prior case law to place a judicial gloss on the requirements of c. 93A. The court today states that "[t]he use of the words `distribution of any services' in conjunction with words such as `sale' and `lease' indicates an intent that the services be distributed in exchange for some consideration or that there must be other strong indications that the services are distributed in a business context." Ante at 493. The language of the statute does not impose the requirements of consideration or a business context. Using these requirements, we have construed G.L.c. 93A to eliminate a purely private single transaction, as well as private transactions between private individuals, from its coverage. See infra at 500. Accepting these limitations, consistent analysis in this case would nevertheless result in the conclusion that the judge correctly applied c. 93A.
In assessing whether the competition between PP, Inc. and PPLM occurs in a business context, I look to the court's prior decisions. Begelfer, supra. Lantner, supra. In the Begelfer *499 decision, supra at 190-191, the various relevant considerations including the nature of the transaction, the character of the parties, the activities engaged in by the parties, and the motivations underlying the transaction are set forth. The court acknowledges that these factors are relevant, but fails to analyze them as they apply to the relationship between PP, Inc. and PPLM. The nature of this "transaction" is characterized by on-going competition. PP, Inc. is not simply operating a charity that provides services; it is engaging in competitive marketplace behavior. PP, Inc. intentionally engaged in acts which confused PPLM's clients and diverted trade or commerce away from PPLM and toward the alternate services PP, Inc. provided. PP, Inc. inserted itself into the market in which PPLM operates and tried to alter the behavior of consumers in that market so that they would use the services distributed by PP, Inc. Cf. American Medical Ass'n v. United States, 317 U.S. 519, 528 (1943) (whether physicians' practice of medicine constitutes "trade" under § 3 of the Sherman Antitrust Act immaterial where purpose and effect of their conspiracy is obstruction and restraint of competitor's business).
Instead of applying this analysis concerning the nature of the transaction and the activities of the parties, the court primarily focuses on the motivation of the parties. The court emphasizes the benevolent goals of PP, Inc.'s employees. While this is part of the relevant inquiry, it ignores the motivations of the corporation, PP, Inc., in entering the market to compete with PPLM. PP, Inc., as determined in part 1, used an unfair method of competition to confuse the public and prospective clients of PPLM. PP, Inc.'s activities were not simply geared towards helping women; they were designed to damage or destroy its competitor. See Costello Publishing Co. v. Rotelle, 670 F.2d 1035, 1049 (D.C. Cir.1981) (charitable motivation does not immunize any action taken from antitrust laws). Clearly these business motivations of PP, Inc., in combination with the nature of the transaction and the activities of the parties, establish the "business context" as contemplated by Begelfer. In fact, in part 1 the court fully considers the business context in which the two corporations are competing. The *500 presence of this business context is essential to the court's resolution of the service mark violation issue. Nevertheless, it ignores its own analysis in part 2.
Finally, the cases relied upon by the court, Begelfer, supra, and Lantner, supra, in particular, involve strictly private transactions which the court has found do not involve a business context. Trade or commerce is defined in c. 93A as including those actions which "directly or indirectly affect[] the people of this commonwealth." Because the private sale of a home, as in Lantner, has no effect on the public, it is beyond the scope of c. 93A. Similarly, the Appeals Court applied this portion of the statute to eliminate private transactions between members of the same partnership from the coverage of c. 93A. Newton v. Moffie, 13 Mass. App. Ct. 462, 467 (1982). The Newton court stated that "the effect of the questioned conduct on the public interest is a relevant consideration in deciding whether the conduct falls within our Act." Id. at 468. Without question, PP, Inc.'s unfair method of competition was designed to have an effect on the public. The potential harm and confusion that resulted from PP, Inc.'s behavior is determinative in part 1 of the court's opinion; yet, in part 2, the court completely ignores the harm to PPLM and the confusion to the public.
The court does not serve the legislative goal of consumer protection by shielding inequitable marketplace behavior from liability on account of the nonprofit or charitable goals of the organization's members. See G.L.c. 231, § 85K (1984 ed.) (abolition of charitable immunity). "Labor, the professions, charitable organizations, etc., are merely auxiliary forces [in the marketplace] and may, therefore, be initially subject to their own ethical or other rules of the games. To the extent, however, that their activities may impinge upon or otherwise affect a competitive contest between businessmen, they may be subject to the rules of the game applicable to those competitors." 1 R. Callmann, Unfair Competition, Trademarks and Monopolies § 1.01 (4th ed. 1981). Those nonprofit organizations participating in the market are as entitled to protection against unfair competition as are other business enterprises. Conversely, simply because an organization is devoted to benevolent *501 purposes does not relieve it of the "obligation to observe the rules of fair play" in the course of its business. See 1 R. Callman, supra at § 1.02. Here, the court has not extended the protection of c. 93A to PPLM despite its determination of unfair competition. Moreover, the court has relieved PP, Inc. of the obligation to follow the rules of fair play by its failure to recognize that PP, Inc. was engaged in the distribution of services.
The court unjustifiably restricts the reach of c. 93A. Under the statute, PPLM need only show that PP, Inc. engaged in trade or commerce. PPLM showed, and the judge found, that "Problem Pregnancy is engaged in giving pregnancy tests, pregnancy counseling and advice and other services relative to pregnancy in the Worcester area." That finding meets both the plain meaning of the statute and the requirements of the statute as interpreted by this court. By its refusal to impose c. 93A liability on PP, Inc., the court protects the defendant's conduct admittedly amounting to unfair competition from the sanctions the Legislature has enacted to prevent such behavior. Because PP, Inc.'s distribution of services was purposefully designed to harm PPLM in its business, the judge correctly imposed liability under c. 93A. I, therefore, dissent.
NOTES
[1] Planned Parenthood League of Massachusetts, Inc. (also licensed as Planned Parenthood Clinic of Central Massachusetts).
[2] This service mark replaced an earlier, similar service mark which was registered in 1982.
[3] General Laws c. 110B, § 12, states: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."
[4] General Laws c. 155, § 9 (1984 ed.), provides in pertinent part: "A corporation organized under general laws may assume any name which, in the judgment of the secretary, indicates that it is a corporation; but it shall not assume the name or trade name of another corporation established under the laws of the commonwealth, or of a corporation, firm, association or person carrying on business in the commonwealth, at the time of incorporation or change of name of the corporation assuming any such name or within three years prior thereto, or assume a name so similar thereto or a name which is under reservation for another or proposed corporation under the laws of the commonwealth as to be likely to be mistaken for it.... The supreme judicial or superior court shall have jurisdiction in equity ... to enjoin such corporation from doing business under a name assumed in violation of any provision of this section, although articles of organization or articles of amendment may have been approved and filed and a certificate of incorporation issued." We note, and the parties have essentially agreed, that this section is not applicable to corporations formed pursuant to G.L.c. 180. See G.L.c. 155, § 1 (1984 ed.).
[5] Title 15 U.S.C. § 1114(1) (1982) reads: "Any person who shall, without the consent of the registrant  (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided."
[6] Because we reach the conclusion that there was common law infringement, we need not discuss the Federal and State statutory arguments. Moreover, it need not be established whether PPLM has a "trademark" or a "service mark" at common law. The standards for determining infringement are the same. West & Co. v. Arica Inst., Inc., 557 F.2d 338, 340 n. 1 (2d Cir.1977).
[7] The record includes a copy of PPLM's certificate of affiliation.
[8] We also point out that it makes no difference whether either PPLM or PP, Inc. is a charitable corporation for purposes of maintaining a common law service mark infringement action. "The statutory and common law regarding the protection of trademarks is similarly applicable to the names of nonprofit religious organization." Christian Science Bd. of Directors v. Evans, 191 N.J. Super. 411, 422 (1983), modified, 199 N.J. Super. 160 (App. Div. 1985). See Anti-Defamation League of B'nai B'rith v. American Italian Anti-Defamation League, Inc., 54 Misc.2d 830 (N.Y. Sup. Ct. 1967).
[9] We also disagree with PP, Inc.'s assertion that in order to be protected, the word "abortion" or "clinic" must be included in the service mark that is supposed to have acquired secondary meaning. PPLM offers services other than abortion. The corporation dispenses birth control information and devices and offers counseling services. Moreover, the fact that PPFA does not itself provide abortion facilities does not effect PPLM's right to be protected under PPFA's registered trademark "PP." As we have stated infra, "PP" stands for Planned Parenthood as a whole, not for just the part of the organization which performs abortions.
[10] Likelihood of confusion is whether the "similarity of names is such as to make likely the deception of any appreciable number of ordinary prudent customers." I.T.S. Industria Tessuti Speciali v. Aerfab Corp., 280 F. Supp. 581, 586 (S.D.N.Y. 1967).
[11] We note that they were not the same women who submitted affidavits in support of a preliminary injunction. PP, Inc. has argued on appeal that the women who testified at trial were "plants." However, the judge made no finding as to their status as such, and there is no information in the record before us to substantiate a finding that they were "plants." Moreover, it was open to the defendant to establish this theory as it related to the credibility of the women. We find no error in the judge's decision allowing the women to testify.
[12] General Laws c. 93A, § 3 (1984 ed.), provides that: "Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States. For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the persons claiming the exemptions."
[13] Chapter 180, §§ 1-29, governs corporations which are set up for various charitable purposes. Included in a long list under § 4 are corporations organized: "(a) for any civic, educational, charitable, benevolent or religious purpose; (b) for the prosecution of any antiquarian, historical, literary, scientific, medical, chiropractic, artistic, monumental or musical purpose; (c) for establishing and maintaining libraries; (d) for supporting any missionary enterprise having for its object the dissemination of religious or educational instruction in foreign countries; (e) for promoting temperance or morality in the commonwealth...."
[14] We recognize that PP, Inc. offered a proposed finding of fact on this precise point and the judge did not include it in his findings.
[15] The definition of "trade" includes: "The act or the business of buying and selling for money; traffic; barter.... The business which a person has learned and which he carries on for procuring subsistence, or for profit; occupation or employment...." Black's Law Dictionary 1338 (5th ed. 1979).
[16] "Commerce" is defined as "[t]he exchange of goods, productions, or property of any kind; the buying, selling, and exchanging of articles." Black's Law Dictionary, supra at 244.
[17] The court in Dallas Cowboys Cheerleaders, Inc., supra at 206, also held that the preliminary injunction did not constitute an unconstitutional "prior restraint" on First Amendment rights because the situation was not one of "government censorship" but instead was a private person's attempt to protect its property rights.
[1] The plaintiff in a G.L.c. 93A, § 11, action must also "engage[] in the conduct of any trade or commerce." In its answer to the complaint, and on appeal, PP, Inc. contends that PPLM is not engaged in trade or commerce. The judge did not directly rule on that point, but we may infer from his imposition of liability on PP, Inc. that he found that PPLM is so engaged. See Schrottman v. Barnicle, 386 Mass. 627, 638 n. 8 (1982). The judge did find as fact "PPLM runs a reproductive health care clinic.... Services provided at the PPLM clinic include out-patient abortions for women." This finding is not clearly erroneous, and is sufficient to support a conclusion that PPLM is engaged in trade or commerce. If by its omission of any discussion of this issue the court means to indicate that it is so obvious as not to merit any discussion, I agree.
[2] General Laws c. 93A, § 1 (b) (1984 ed.), provides in full: "`trade' and `commerce' shall include the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth."
[3] This court has consistently held that when the statutory language is plain, the words must receive their "usual and natural meaning." Commonwealth v. Thomas, 359 Mass. 386, 387 (1971).
[4] "Passing off" has been characterized as the "essence" and the "typical and most common case of [common law] unfair competition." 1 R. Callmann, Unfair Competition, Trademarks and Monopolies § 2.02 (4th ed. 1981), and cases cited.
[5] This principle was applied in a situation factually similar to the case at bar. Summerfield Co. v. Prime Furniture Co., 242 Mass. 149 (1922). In Summerfield, the defendant, a "later comer," opened a store near the plaintiff's store and sought to make the stores look similar. The defendant's conduct was calculated to confuse the public. The court enjoined this behavior stating that the "defendant has equal right with the plaintiff to solicit the patronage of the public. But it has no right intentionally to mislead the public to the harm of the plaintiff...." Id. at 155. Moreover, the Summerfield court stated that this principle is not limited to any particular set of facts, but instead applies equally to any methods of deceit designed to divert customers. Id.