King, J.
INTRODUCTION
The plaintiff, Allan Eisenberg, commenced this action in the district court to recover damages he sustained because of his reliance on representations made by the defendants that no special assessments were planned relative to a condominium he was purchasing in the city of Worcester, Massachusetts.
The case was heard jury waived in the Worcester District Court. After trial, a judgment entered in favor of the plaintiff on Count I (intentional misrepresentation), Count III (violation of G.L.c. 93A), and CountV (negligent misrepresentation) in the amount of $5,657.00. The damages on the plaintiffs G.L. 93A claim were trebled to $16,971.00, plus attorneys fees in the amount of $7,000, and costs of $755.32, for a total of $24,726.32 on the plaintiffs G.L.c. 93A claim. The defendants then removed the case to the Superior Court pursuant to G.L.c. 231, §104. The case was tried to a jury on December 2, 1998 on plaintiffs claims of intentional misrepresentation and negligent misrepresentation. The promissory estoppel claim u nder Count II was withdrawn by the plaintiff at the time of trial. Plaintiffs G.L.c. 93A claim was reserved by the Court.
On December 2, 1998, the jury returned a verdict in favor of the defendants on Count 1, for intentional misrepresentation, and in favor of the plaintiff on Count V, for negligent misrepresentation, in the amount of $8,000.
The defendant subsequently filed a motion for a judgment notwithstanding the verdict. Argument was heard on that motion as well as on the plaintiffs G.L.c. 93A claim on April 26, 1999. After considering the arguments of counsel, the stipulation of facts, and the credible evidence introduced on plaintiffs G.L.c. 93A claim, the court makes the following findings and rulings.
I. DEFENDANTS’ MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT. BACKGROUND
The defendants have complied with all the procedural requirements for the filing of their motion for judgment notwithstanding the verdict. Mass.R.Civ.P. 50(b). In ruling on a motion for judgment notwithstanding the verdict, the court is bound to consider whether, anywhere in the evidence, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff. The evidence must be considered in the light most favorable to the plaintiff. Evidence which contradicts the evidence favorable to the plaintiff must not be considered. Moose v. Massachusetts Institute of Technology, 43 Mass.App.Ct. 420, 421 (1997). In the case at bar, viewing the evidence in a light most favorable to the plaintiff, the jury was warranted in finding the following facts concerning the plaintiffs negligent misrepresentation claim.
The plaintiff, Allan Eisenberg, resides at Greenwich Court Condominium, 60 Salisbury, Unit 301, Worcester, Massachusetts.
The Salisbury Green Condominium (the condominium) is a 94-unit residential condominium situated on Salisbury Street in Worcester, Massachusetts. The condominium was created by Master Deed, dated May 11, 1987, recorded at the Worcester Registry of Deeds. The condominium, which was constructed in 1987, consists of 15 buildings with clapboard exteriors and deeply sloped, shingled, mansard roofs.
The Salisbury Condominium Trust is the organization of unit owners for the condominium. It acts on behalf of the unit owners to operate and maintain the common elements and regulates the condominium. G.L.c. 183A, §8(1) and §10(a). At all times relevant to this case, the trustees of the Condominium Trust were the defendants, Lee Pledger, Charles Hastie, and Albert Jones (the Trustees), all of whom own or owned units at the Salisbury Green Condominium.
The Trustees were responsible for the management of the condominium as well as the repair, replacement and maintenance of the common areas and facilities. The roofs on the buildings at the Condominium are defined in the condominium documents to be part of the common areas and facilities.
*346 The defendant, Phoenix Association Management, Inc. (Phoenix), is a Massachusetts business corporation. At all times relevant to this case, Phoenix was engaged by the Trustees to act as their agent and to assist in the operation and maintenance of the condominium and, in particular, the common areas and facilities.
In early April 1994, the plaintiff, Allan Eisenberg, executed an Offer to Purchase Unit 301 at the condominium from John R. Lakian for $130,000. The plaintiff then hired the Hallmark Home Inspection Service (“Hallmark”) to inspect the condition of Unit #301. The inspection report, dated April 15, 1995, stated that Unit 301 was generally in good condition but it needed some minor repair work including minor repairs to the roof. The plaintiff wanted assurances that the Condominium Association would be responsible for repairing the roof leaks found by Hallmark. A real estate agent, employed by the seller, subsequently obtained verification from Phoenix that the Association would be responsible for making the repairs to the roof.
On May Í8, 1994 the plaintiffs signed a Purchase and Sale Agreement to purchase Unit 301. An Addendum to the Purchase and Sale Agreement required the seller to deliver a Certificate of Insurance showing that the common areas of the condominium were insured, and a "section 6(d)” certificate showing that there were no unpaid common area expenses. A Second Addendum required, among other things, that certain repairs, including repairs to the roof, be made prior to the closing. Nothing in the Purchase and Sale Agreement mentions special assessments. Paragraph 22 of the Purchase and Sale Agreement provides that if the plaintiff defaults at the closing, the seller is entitled to keep the $6,000 deposit paid by the plaintiff as damages. Paragraph 38 of the Purchase and Sale Agreement states that the plaintiff received a “satisfactory inspection of the unit and accepts it in an ‘as is’ condition, without reliance on any warranty or representation of any kind, with the exception of the repairs required by paragraph 42 of the Second Addendum.” Those repairs were all made before the closing.
The closing for the purchase and sale of unit 301 took place on May 31,1994. At the closing, the plaintiff was shown a “condominium affidavit” (Ex. 5) signed by Judson Goodnow of Phoenix. This condominium affidavit, dated April 14, 1994, was executed at the request of the bank that was providing the financing for the purchase of Unit 301 by the plaintiff.[2] This affidavit was executed by Mr. Goodnow pursuant to his regular employment responsibilities for Phoenix, which was acting as the agent of the Trustees. The affidavit was then sent to the plaintiffs bank. In the condominium affidavit, Mr. Goodnow answered 17 questions. Question 8 asked “Are there any special assessments now planned, or have there been any in the past?” This question was answered, “NO.” If the question 8 is answered “YES,” the questionnaire goes on to request: “the nature of the assessment, what it was for, the total amount of the assessment, the per unit charge, and the time period over which it is to be collected.” When the plaintiff closed on the purchase of Unit 301 on May 31, 1994, he relied on this statement in the affidavit that there were no planned special assessments. He would not have gone forward with the purchase of Unit 301 had he been informed that a special assessment was likely.
Mr. Goodnow was negligent in answering question 8 “NO.” In fact there had been a prior special assessment, That prior special assessment was not material to this case because it had been paid off by the time the affidavit was executed. Also, a special assessment was being planned and Mr. Goodnow knew that it was likely that Phoenix would impose a special assessment in the near future to repair roofs.
Neither Phoenix nor the Trustees ever had any direct dealings with the plaintiff. The Purchase and Sale Agreement makes no reference to the condominium affidavit. There is no evidence that the subject of special assessments ever came up in connection with the purchase of Unit 301 until the plaintiff read the affidavit at the closing. The plaintiff was represented by counsel at all times in connection with his purchase of Unit 301.
DISCUSSION
In the case at bar, the jury found the defendant liable for negligent misrepresentation. A defendant can be found liable for negligent misrepresentation if, “in the course of his business, profession, or employment . . . [he] supplies false information for the guidance of others in their business transactions,” “fails to exercise reasonable care ... in ... communicating the information,” and others justifiably rely on such false information. That liability is limited to “loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it, and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.” Restatement (Second) of Torts, §552(1) (1977), adopted by the Supreme Judicial Court and Nycol Corporation v. KPMG Peat Marwick LLP, 426 Mass. 491, 496-97 (1998). The affidavit upon which the plaintiff relied was prepared at the request of the plaintiffs bank. It was not prepared for the plaintiff. The plaintiff testified that he saw the affidavit at the closing and that he relied on it when he made the decision to go forward with the closing. Accepting these facts as true, plaintiff still has not satisfied the reliance requirement for a negligent misrepresentation action. Prior to the receipt of the affidavit, the plaintiff signed a Purchase and Sale Agreement obligating him to purchase Unit 301. The seller complied with all requirements of the Purchase and Sale Agreement and was ready, willing and able *347 to deliver the deed on May 31, 1994. The plaintiff had no right to avoid his contractual obligations upon receipt of the affidavit. Had he done so, he would have been in default of his obligations under the Purchase and Sale Agreement, and the seller would have been entitled, pursuant to Paragraph 22 of the Purchase and Sale Agreement, to keep the plaintiffs $6,000 deposit as liquidated damages. As a matter of law, there was no detrimental reliance where the plaintiff was already contractually obligated to proceed with the purchase of unit 301 at the time he received the condominium affidavit.
Thus, considering the evidence in a light most favorable to the plaintiff, the jury was not warranted in finding that the plaintiff relied to his detriment on the information contained in the condominium affidavit. Given these circumstances, the court will grant the defendants’ motion for judgment notwithstanding the verdict.
II. FINDINGS AND RULINGS ON PLAINTIFF’S G.L.c. 93A CLAIM BACKGROUND
With regard to the plaintiffs G.L.c. 93A claim, the court incorporates all of the findings made above except for those findings set forth below which are inconsistent with the above findings. Within a few years after the condominium was occupied, many of the units experienced roof leaks and internal damage during the winter months. The first problems arose during the winters of 1992 and 1993. The condominium units with cathedral ceilings were affected the most, but other units also sustained some degree of damage. During the summer of 1993, the Trustees voted to repair the roofs to prevent future damage. The Trustees also raised the monthly maintenance fee to provide the funds needed to support long term maintenance needs. During the summer of 1993, protective membranes were added on several units and new shingles were placed over the protective membranes. Nonetheless, more leaks were experienced during the 1993-94 winter. Leaks occurred in 56 out of the 94 units. Some of the leaks were minor, but many of them were major. All the buildings that were repaired during the summer of 1993 sustained some damage. The trustees then voted to hire Noblin and Associates, a consulting engineering company, to study the problem and recommend a remedy for the problem. This survey was not completed until June 1994, two months after the condominium affidavit in question was executed by Mr. Goodnow. On May 31, 1994, the Trustees voted to hold a special meeting on June 16, 1994 to discuss a special assessment. At the June 16, 1994 special assessment meeting, after considering their options, the Trustees voted to impose a special ass ;ssment on all condominium unit owners. On April 14, 1994, when Mr. Goodnow executed the condominium affidavit, there were no special assessments planned. Mr. Goodnow’s answer to affidavit question 8 regarding any planned special assessments was true when it was made and continued to be true at the May 31, 1994 closing. Hence, even assuming that G.L.c. 93A applies to the facts of this case, the defendants committed no unfair or deceptive trade practices.
Moreover, even if the facts alleged by the plaintiff were true, the transaction in question does not fall within G.L.c. 93A. The plaintiff brings this G.L.c. 93A claim pursuant to §9 of the statute. G.L.c. 93A prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. G.L.c. 93A, §2(a). This statute provides a private right of action for any person “who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by §2 or any rule or regulation issued thereunder...” G.L.c. 93A, §9(1). Remedies under Chapter 93A are not available “where the transaction is strictly private in nature, and is in no way undertaken in the ordinary course of trade or [commerce].” Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 491 (1986) quoting Lantner v. Carson, 374 Mass. 606, 608 (1978).
“ Trade’ and ‘commerce’ shall include the advertising, the offering for sale, rent, or lease, the sale, rent, or lease, or distribution of any services and any property, tangible or intangible, real, personal, or mixed . . .” G.L.c. 93A, §1(6). In determining whether parties to a transaction are engaged in trade or commerce, the court must consider “(1) the nature of the transaction, (2) the character of the parties, (3) the activities participated in, and (4) whether the transaction was motivated by business or personal reasons." Barrett v. Mass. Ins. Insolvency Fund, 412 Mass. 774, 775-76 (1992); Planned Parenthood, supra at 491.
In the case at bar, plaintiff, a purchaser of -unit 301 at the Salisbury Green Condominium has sued the Salisbury Green Condominium Trust, the organization of unit owners, and Phoenix Management, an independent management agency, contending that alleged misrepresentations constitute a violation of G.L.c. 93A. Neither defendant ever had any direct dealings with the plaintiff.
The Salisbury Condominium Trust is not an entily engaged in trade or commerce. See Planned Parenthood, supra. The trust is comprised of elected agents of the unit owners, whose responsibility is to administer the common areas of the condominium. They receive no compensation for their services; thus, their actions are not motivated by business purposes, but rather, they act for the purpose of managing and operating the common areas of the condominium. Moreover, at all times relevant to this case, Phoenix was engaged in a business relationship with Salisbury Condominium Trust to act as their agents and to assist in the operation and maintenance of the condominium and, in particular, the common areas and facilities. Specifically, Phoenix provides property man *348 agement services to the Trustees, including communicating with the general public on the Trustees’ behalf. As agents of the Trustees, Phoenix does not have the relationship with plaintiff that would subject it to liability under G.L.c. 93A. See Nei v. Boston Survey Consultants, Inc., 388 Mass. 320, 324 (although recognizing that G.L.c. 93A does not have a specific privity of contract requirement, the court held that it was significant that neither defendant had a contractual or business relationship with the plaintiff). In sum, prior to the purchase of unit 301, the plaintiff had no relationship with Phoenix, the condominium, or the Trustees. He only dealt with the seller, Mr. Lakian, who is no longer a party to this action, and the broker who was employed by Mr. Lakian.
For the above reasons, the court finds in favor of the defendants with regards to the plaintiffs G.L.c. 93A claim.
Accordingly, it is hereby ORDERED that:
(1) Judgment enter in favor of the defendants on Count V of the complaint notwithstanding the verdict of the jury.
(2) Judgment shall enter in favor of the defendants with regard to all the plaintiffs remaining claims.

 G.L.c. 183A, §6(c) provides that a condominium unit owner’s share of the common expenses shall constitute a lien upon his unit. “Such lien shall have priority over all other liens, except municipal liens and first mortgages of record." Banks taking a purchase money mortgage on condominiums customarily require a certificate pursuant to §6(d) of G.L.c. 183A showing that there are no unpaid common expenses owed on the unit which is the subject of the mortgage.