Wilkins, Douglas H., J.
Each party in this case alleges trademark infringement, unfair competition and other unlawful acts by the other. Plaintiff Groove Entertainment, Inc. (“GEI”)[1] alleges that defendant GrooveBoston, LLC’s (“GBL”) use of “GrooveBoston” violates its trademark in “groove” and “Groove Entertainment.” GBL alleges that GEI’s recent acquisition and use of the domain name “grooveboston.net” infringes its trademark in “GrooveBoston” and the associated domain name, “grooveboston.com.” The parties have cross moved for preliminary injunctive relief. The Court reviewed the parties’ submissions, heard oral argument on January 5, 2011 and received supplemental filings on January 7, 2011. After review of the parties’ oral and written submissions, GEI’s motion is ALLOWED IN PART AND DENIED IN PART; GBL’s motion is ALLOWED.
BACKGROUND
Based upon a necessarily abbreviated record, I make the following preliminary findings of fact.
Joseph C. Toto, Jr. started GEI in 1984 under the name D.J. Toto & Associates, Inc. to provide services for weddings, corporate and other special events, including disc jockeys, lighting, videos and decor and the like. In the mid-nineties, he began using the name “Groove Entertainment” for his business. He also *614 states that he became known “colloquially” in the industry as “Groove” or “Groove Boston.” In 2001, he formally changed the corporation’s name to “Groove Entertainment, Inc.” at the Massachusetts Secretary of State’s office. On September 4, 2009, the Secretary of State granted GEI registration of the service mark “Groove Entertainment” in connection with “event planning services, namely coordinating music, lighting, entertainment, photography, videography for special events and celebrations such as weddings, holiday parties and corporate functions.” Its application represented that GEI had been using that mark since June 1, 1994. Attached to the application was a specimen advertisement showing the words “GROOVE entertainment” in an oval above text that began: “the finest wedding entertainment/professional disc jockeys and masters of ceremony/live bands & orchestras.”
GEI now has six employees and customers throughout Massachusetts and the United States, with satellite offices in Boston, Peabody, Danvers, Rhode Island and Florida. It markets and advertises its service mark and corporate identity through print, radio, television, the internet and the yellow pages, including wedding websites, several Boston wedding magazines and brochures in at least fifteen major hotels in the Boston area. It has a website, www.grooveentertainment.com, and has purchased the domain names groovelight-ing.com, grooveevents.us, groovemyevent.com, bostondj.net and djsboston.net, some of which are directed to GEI’s main website. It advertises on Google and with other search engines. It attends and advertises extensively at various trade shows for brides, universities, corporate events and bar mitzvahs.
To corroborate its testimony, GEI presented a number of invoices, all addressed to “Groove” at GEI’s address. The invoices dated March 13, 2001 reflect purchases of 5,000 postcards described as “general ‘Groove Boston’ ”[2] and 2,000 each of letterhead and envelopes with raised lettering in blue ink, described, again as “Groove Boston.” It purchased 500 additional “Groove Boston” letterhead, along with 500 unspecified “2-color envelopes”[3] on April 23, 2004, suggesting that it had nearly depleted its initial stock of 2,000 pieces of Groove Boston stationery in a little more than three years. This translates very roughly to a rate of about 50 pieces used per month from 2001 through 2004. That rate is substantial.
By its nature, stationery is made for sending. While the record is unquestionably abbreviated on the nature of GEI’s use of the Groove Boston name, I infer from the invoices and Mr. Toto’s general testimony that GEI was using that name at least on its stationery in commerce during the period 2001 through 2004. That period brackets GBL’s purchase in 2002 of the domain name “grooveboston.com” as found below. The reduced quantity of Groove Boston items ordered in 2004 and the absence of any subsequent order for Groove Boston stationery is some indication of a decline in the use of Groove Boston, as least on stationery. However, it was not unusual for non-electronic forms of communication to diminish generally during that period and I draw no definitive conclusions from the stationery orders alone.
GEI also presented invoices for dozens of caps, T-shirts, and CD holders using the words or logo “Groove Boston” at various times from 1997 to 2008, in addition to the stationery purchases in 2001 and 2004. I therefore reject the assertion in GBL’s papers that Mr. Toto first purchased materials emblazoned with Groove Boston in 2002. However, GEI does not elaborate upon how it used all these invoiced items, leaving the exact nature and extent of such use unproven. I infer that GEI used them in the course of its business, for they would have served little or no purpose otherwise and such use is consistent with Mr. Toto’s and Mr. Green’s general testimony that GEI used Groove Boston in commerce.
The most recent invoices in the record reflect one order for six Groove Boston frames on September 21, 2006 and an order for a dozen shirts with the Groove Boston logo on August 5, 2008. GEI has not presented evidence of an offsetting increase in use of “Groove Boston” in electronic media from the mid-2000s to the present. In the many pages of GEI’s website listing events in October 2010 through New Years Day, not one record instance of “Groove Boston” occurs; GEI referred to itself as Groove or Groove Entertainment. Based upon all of this evidence, I find an overall pattern of generally declining use of the phrase “Groove Boston” by GEI after the mid-2000s and no significant use in commerce after 2006.
GEI has also presented affidavits and other information from two customers and four industry professionals[4] attesting to an understanding that GEI was “Groove” located in Boston and expressing confusion between GEI and GBL based upon both companies’ use of “Groove.” With the exception of Mr. Green, president of the International Special Events Society (“ISES”), none of them reports that GEI is known as “Groove Boston.” GEI’s general manager attests to confusion by one existing but unnamed client (who may or not be the same client who submitted an affidavit or email) and inquiries from potential customers and peers asking whether GBL was associated with GEI. GBL points out correctly that GEI presented only one affidavit from a GEI customer. However, I also credit the email from Ms. Meuse, because her statement that she called GBL based upon her Google search of “groove boston” after receiving a recommendation of GEI by the Danversport Yacht Club is inherently plausible.[5] Indeed, it is consistent with the general acknowledgment by GBL that it has received an unspecified number of similar erroneous inquiries since 2004.
*615 GEI’s website[6] refers to “Groove entertainment & lighting” and has links for weddings, corporate, music, photography, videography, lighting and Jewish weddings, among other things. An unspecified number of testimonials from customers and blogs on GEI’s website, including the five attached to Mr. Toto’s affidavit, refer to GEI as “Groove,” “Groove Entertainment” or both.
Mr. Toto does state that he has operated and been known in the industry not only as Groove and Groove Entertainment but also as Groove Boston continuously for fifteen years. This statement arguably receives corroboration in Mr. Green’s affidavit, but not from any other third-party witness, none of whom identifies GEI as “Groove Boston.” Mr. Green’s testimony focuses broadly on a fifteen-year period without specificity as to particular usage at any particular time and may turn out to be consistent with the conclusions drawn above from the invoices. Mr. Green also has a long acquaintance with Mr. Toto. At this stage, I credit the more clearly disinterested witnesses who identify GEI only with “Groove” and “Groove Entertainment.”
For its part, GBL is the creation of its owner, Robert M. Dutton, who started operating as a novice disc jockey in 1998 under the name “DJ Bob Enterprises.” Shortly thereafter, he offered DJ services as “Groove Entertainment” until he learned about similarly named businesses providing similar services. He also states that he “learned generally of the widespread use of the term ‘groove’ within the event services industry.” He then “sought a distinctive name” for his business, which he says he renamed “ ‘GrooveBoston’ in or about late 1999/early 2000,” although he presents no documentary proof to establish this timing and does not discuss how he used that phrase at that time. I consider the allegation of GBL’s use of the name in 1999/2000 to be unproven at this stage. I do not credit Mr. Dutton’s affidavit on this point, since it conflicts with the dates in GBL’s recent trademark application and appears based solely upon an imprecise memory (“in or about”) which, if accurate, should be susceptible of at least some sort of documentation or corroboration. In any event, the precise date is not crucial to decision of this motion, because GEI has presented documented testimony establishing some use of Groove Boston before 1999, which makes its use senior to GBL’s.
I do credit Mr. Dutton’s unrebutted testimony that GBL purchased the domain name “grooveboston.com” in 2002. Mr. Dutton organized GBL as a limited liability company in Massachusetts on March 17, 2004. On December 30, 2010, GBL applied for and received the service mark “GrooveBoston” in connection with “Entertainment services; Disc jockeys for special events; design and production of mobile nightclub events.” Its application showed a distinctive label with the letters GB and the name GROOVEBOSTON beneath a decibel meter. It stated that GBL had been using the service mark since December 1, 2003, which undercuts Mr. Dutton’s affidavit.
Starting in the mid-2000s, GBL focused entirely upon creating and expanding the “mobile club” market as its core product and service. It says that, shortly after its incorporation in 2004, it shifted its focus away from “traditional DJ services provided at weddings and corporate events to large-scale events on college campuses and other similarly situated institutions and clients.” It asserts that “(t]he services rendered by GrooveBoston are not presently appropriate for traditional proms, weddings or corporate events.” While Mr. Dutton candidly acknowledges “some overlap in the types of services rendered by” GEI and GBL, he states that “the services are largely distinct, providing different services and overall experiences to distinct client bases.”
For instance, one of the “frequently asked questions” on GBL’s website explains what GBL will and will not do regarding weddings:
Do you do weddings?
No. Well, that’s not totally true. If you’re looking to have a wedding that consists entirely of a crazy dance party, then of course. If you’re looking for a guy in a sparkly vest that will know just what to say to introduce your spouse’s Grandmother . . . ummm, no thanks.
The website also states that GBL will book a DJ without a mobile club for a venue that already has lighting and audio. In response to the question whether GBL does proms, the website says that GBL “work[s] a select handful of high school events every year” and has “a team that works on more fypical-sized high school events.” I find that, while GBL focuses upon the mobile night club business, it has made some broader statements in commerce and at the Secretary of State’s office that include more typical proms and events in its business under the name GrooveBoston.
There is a dispute about when GEI first learned of GBL. Mr. Toto states that he did not learn of Groove-Boston until August 2010. GBL has countered with an affidavit of its former general manager, Ben Huggins, who states that Mr. Toto approached him at a meeting of ISES on or about September 16, 2008, asked whether he was from GrooveBoston and told him that he would like to speak to Robert Dutton, manager at GrooveBoston. Mr. Dutton’s email of August 12, 2010, beginning . it’s probably time we talked," suggests that Toto and Dutton did not speak, if in fact Toto met Huggins in 2008. It also implies that Dutton had known for at least some time that the day would come when they needed to discuss the overlap. At this preliminary stage, it appears likely that the extent of overlap between the businesses of GEI and GBL was not apparent to Mr. Toto until the summer of 2010, *616 although it is also likely that GEI and Mr. Toto had at least heard of GrooveBoston in the fall of 2008. The issue of when GEI learned of GBL does not affect the outcome of the preliminary injunction motions.
In or about August 2010, Mr. Toto received an ISES newsletter, containing an advertisement with GrooveBoston’s name prominently displayed. Mr. Toto asked ISES’s president, Larry Green, about Mr. Dutton. Mr. Green stated that he thought Mr. Dutton worked for GEI. On August 13, 2010, Mr. Toto received an email from Mr. Dutton entitled “Groove Overlap.” The email states that Mr. Dutton started using the name “Groove Entertainment” in 1999, but later realized that “there were quite a few other (Groove Entertainments] across the US ... In the interest of differentiation, I adopted ‘Groove Boston’ and have used it since.” Mr. Dutton stated that “(w]ith ‘Groove’ in both of our company names, there has, at times, been confusion, and I have received a few phone calls over the years, where people have been looking for yours.” The email also expressed the view that “our products are very different: weddings and corporate events are not my focus; we have developed our ‘mobile club’ niche, and our events are typically large-scale college dance parties and private events looking for something along those lines.”
GBL has supported its own claims of service differentiation by submitting three affidavits of third parties familiar with GrooveBoston and the industry. One, from a college director of student programs,[7] attests to GBL’s popularity in the college event circuit and states that GBL provides “a mobile nightclub experience” that traditional DJs cannot match. Three others, from people in the special events business,[8] attest to their knowledge of both GEI and GBL, as well as their observation that the two businesses provide distinct services to different clienteles. According to one of the affidavits, “GrooveBoston provides a temporary, mobile ‘nightclub’ experience for its customers, inclusive of providing audio, video, nightclub lighting, staging and nightclub-type DJs who mix and scratch their music before a nightclub audience.”
GBL has also presented a list of six entities (not counting the parties), listed with the Massachusetts Secretary of State, Corporations Division, using the word “groove” in their names. It has not identified the nature of these entitles’ businesses[9] and its list therefore has no probative value in this trademark case.
After the August 10 encounter at ISES and the resulting email, Mr. Toto claims that he tried to reach out to Mr. Dutton. Instead of resolving matters, the parties escalated the dispute by engaging in what they apparently believed were self-help measures. GEI’s purchase of the domain name “grooveboston.net” and GBL’s registration application for “GrooveBoston” at the Secretary of State’s office on the last business day of 2010 put them on a collision course.Thenext business day, GEI filed this county’s first lawsuit of 2011, knowing that if it did not sue, GBL would have.
GEI asks the Court to enjoin GBL preliminarily and permanently from any of the following actions within Massachusetts: (1) “using the mark Groove-Boston, or any other mark confusingly similar to Groove’s mark, alone or in combination with other words or [graphics] in connection with event production services” and related services; (2) “using in any manner any trade name, words, abbreviations or any combinations thereof which would imitate, resemble, or suggest the mark Groove or Groove Entertainment”; (3) otherwise infringing Groove’s mark; and (4) “unfairly competing with Groove, diluting the distinctiveness of Groove’s mark, and otherwise injuring Groove’s business reputation in any manner.”
GBL asks for a preliminary injunction that GEI “cease and desist from the use of the internet domain name www.grooveboston.net and that it refrain generally from advertising and/or promoting itself in any way using together the words ‘groove’ and ‘Boston.’ ”
DISCUSSION
A party seeking a preliminary injunction must prove a likelihood of success on the merits of the case and a balance of harm in its favor when considered in light of the likelihood of success. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). “In trademark cases, likelihood of success on the merits is of particular consequence because ‘resolution of the other three factors will depend in large part on whether the movant is likely to succeed in establishing infringement.” Operation Able of Greater Boston, Inc. v. National Able Network, Inc., 646 F.Sup.2d 166, 171 (D.Mass. 2009), quoting Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006).
I. LIKELIHOOD OF SUCCESS ON THE MERITS
To succeed on the merits here, each party, as movant, must show that the mark in question is entitled to trademark protection and that the allegedly infringing use is likely to cause consumer confusion. Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008).
A. Trademark Protection
The parties dispute whether the word “groove” is entitled to protection as a service mark when used in their businesses, although they both claim protection when they combine it with “entertainment” or “Boston.” GEI argues that “groove,” as used in its business, is “suggestive” and therefore inherently distinctive and protected. GEI further supports its conclusion with evidence from its referral sources that “Groove” means Mr. Toto’s business. GBL *617 claims that the word, by itself, is generic and therefore not entitled to protection. See generally Operation Able, 646 F.Sup.2d at 171, citing Boston Duck Tours, 531 F.3d at 12. I find that “groove” is not generic, because it does “not merely designate what [GEI’s] services are.” Id. Nor does it convey an immediate idea of the qualities or characteristics of either party’s services; it “requires imagination, thought and perception to reach a conclusion as to the nature of’ those services. Operation Able, 646 F.Sup.2d at 171, quoting Equine Techs., Inc. v. Equitechnology, Inc. 68 F.3d 542, 544 (1st Cir. 1995). It answers the question “who is it,” rather than “what do they do.” See Boston Duck Tours, 531 F.3d at 14. It follows that “groove” is suggestive and entitled to protection.
Interestingly, GBL’s own affidavits and attachments establish that the word “groove” in combination with “Boston” suggests the business, not the generic nature of the services. With the exception of Mr. Green, that business is understood to be GBL. It is not the word “Boston” or “Entertainment” that conveys this message, as the name of the city and the description of services are clearly generic. It is the word “groove” that sends that message, even though, perhaps for tactical reasons, GBL does not claim that anyone knows it by the term “Groove” alone.
GBL argues that the Court must determine the primary significance of the phrase at issue “to the relevant public,” by considering consumer surveys, the use of the term in media publications, the use of the term by competitors in the industry, purchaser testimony and the plaintiffs use of the term. Boston Duck Tours, 531 F.3d at 18. Dictionary definitions are evidence of the public’s understanding, but are not determinative. Here, as GEI points out, the word “groove” has a number of dictionary definitions, none of which denotes a company that provides DJs for weddings, proms, corporate events and the like. The same is true of the combination, “Groove Entertainment.” GEI has presented evidence that at least some industry professionals and referral sources use “Groove” to identify it as a specific company, not to identify DJ or wedding/prom services generically. Postings on its website confirm this usage. To be sure, there are no consumer surveys at this stage of the proceedings, but the apparently unsolicited postings of GEI’s customers serve a similar purpose. GEI’s own use of the word suggests its business, rather than a generic type of services. Indeed, its logo displays the word “GROOVE” prominently, in type that is many times larger than “entertainment & lighting,” confirming the effort to establish that word as the most important part of its identity and leaving the generic description of its services to smaller type. GBL’s evidence that six other companies use “groove” in their name does not show that those companies use the term generically.[10] On the evidence as a whole, the use of “groove,” including “Groove Entertainment” and “GrooveBoston,” is suggestive, not generic. Cf. Equine Techs., 68 F.3d at 544 (“Equine Technologies” is suggestive and not merely descriptive) .
B. Likelihood of Confusion
That does not end the inquiry. GEI and GBL must also demonstrate likelihood of confusion, which turns upon consideration of eight factors: 1) similarity of the marks, 2) similarity of the services, 3) relationship between the parties’ channels of trade, 4) relationship between the parties’ advertising, 5) classes of prospective purchasers, 6) evidence of actual confusion, 7) defendant’s intent in adopting its mark, and 8) strength of plaintiffs mark. Operation Able, 646 F.Sup.2d at 174, citing Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981).
The Supreme Judicial Court has adopted a nearly identical test under Massachusetts common law, which protects service marks that have acquired a secondary meaning, that is, a mental association in the buyers’ minds between the mark and a single source of the service. Planned Parenthood Fed’n of Am. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 486 (1986).[11] See also Castricone v. Mical, 74 Mass.App.Ct. 591, 594 (2009). Accordingly, even if the marks were not inherently distinctive, I find, based upon the analysis below, that they have acquired a secondary meaning in the minds of buyers such that “Groove” and “Groove Entertainment" are associated with GEI and GrooveBoston is associated with GBL.
1. Similarity of the Marks. In assessing similarity, the Court considers the two marks’ “sight, sound, and meaning.” Boston Duck Tours, 531 F.3d at 24. The crux of the matter is the use of the identical word “groove” by both companies. The Court places emphasis on this non-generic portion of the marks, rather than upon the “weak, descriptive” terms, “entertainment” and “Boston.” Id. The fact that the marks begin with the term “groove” and then add another word without punctuation is also similar, although the difference in number of syllables of the two marks produces a different cadence and sound. The essentially descriptive nature of the second word in each mark does not greatly distinguish the two marks. The marks convey a similar meaning through the word “groove,” which promises an exciting and enjoyable experience of some unspecified kind, thereby piquing interest. The word “entertainment” differs somewhat from “Boston” by clarifying which definition of “groove” is indeed intended (i.e. not definitions such as a “long narrow channel” or a “fixed routine”), but GBL uses the same meaning. The addition of “Boston” only distinguishes the *618 marks slightly, as it merely designates a geographic location that is essentially the same as GEI’s location. When used in conjunction with the logos, the two marks are readily distinguishable, as GEI’s blue oval with white lettering is distinct in color, shape, appearance and content from GBL’s rounded rectangle with decibel meter and “GB.” That “Groove Boston” has a space between the wordsand“GrooveBoston”doesnot is inconsequential, as the difference is barely noticeable. Based upon all these considerations, I find that the marks, “Groove Entertainment,” “Groove” and “GrooveBoston” are moderately similar.
Of course, as to GBL’s motion, “grooveboston” and “grooveboston.net” are virtually identical. There is no material difference in sight, sound and meaning, because the suffix ."net" is merely the means for turning the distinctive mark into a url. Compare China Clipper Restaurant, Inc. v. Yue Joe, 312 Mass. 540, 542 (1942) (generic trade names consisting of two generic words were distinguished by adding “Inc.” to one of them). It is hard to imagine greater similarity, short of absolute identity.
2. Similarity of Services. The parties hotly contest whether their services are similar. This goes to the core of the dispute. Both parties agree that there is at least some overlap, as they both offer their services to weddings and similar events. Mr. Dutton himself recognized the overlap in his initial email and his affidavit. GBL’s December 30, 2010 service mark application purports to encompass a broad group of services that clearly includes those offered by GEI, namely “Entertainment services; Disc jockeys for special events; design and production of mobile nightclub events.” That assertion suggests a very high degree of similarity. However, I view the first two phrases of this description more as an overblown claim of turf than a description of what GBL actually does.
I find that the current degree of overlap is much more modest in fact than GBL’s application suggests. Weddings appear to account for only a small portion of GBL’s business, as its willingness to do weddings is explicitly limited to so-called non-traditional events. Supporting GBL’s position are the three affidavits discussed above, as well as its website, which make it reasonably clear that it does not provide traditional wedding, bar/bat mitzvah, corporate, prom or holiday functions. That GEI’s customers, though initially confused, ultimately realized that GBL did not provide what they wanted also confirms the distinction between the companies’ primary services. Finally, I find it unlikely that Mr. Toto would be unaware of GBL’s existence and use of the word “groove” until the summer of 2010[12] if, in fact, there was a substantial overlap between the companies’ services. The market appears to recognize a distinction between GBL’s mobile nightclub services and GEI’s event services, including weddings, proms, bar/bat mitzvahs and corporateevents.
The fact that some overlap already exists in the parties’ operations portends even greater problems in the future if either business model evolves or changes. The same danger exists if GBL starts providing the broad range of services described in its trademark registration application. GBL’s understandable desire to reserve the right to expand its business in the future as its owner grows older, however, conflicts with the implicit premise of its attempt to justify using a name that contains “groove” by differentiating the services offered by each party. The existing overlap, combined with the possibility that the overlap is growing and will likely continue to grow, weighs heavily on the potential for confusion. This is a case where, because of the similar technical capacity and talent of each company (including the ability to supply sound, lighting and DJs, for instance), prospective purchasers would expect GBL to expand into the area first occupied by GEI. See Restatement (Third) of Unfair Competition, §21(e); See also Great Scott Food Market, Inc. v. Sunderland Wonder, Inc., 348 Mass. 320, 323 (1965) (noting “the doctrine of reasonably ex-pectable expansion of business”). I find that the nature of the services cuts against the broadest claims of infringement, but strongly in favor of those claims as to the services that do or will overlap.
3. Channels of Trade, Advertising and Classes of Prospective Purchasers.[13] This dispute arose in 2010 precisely because GBL began using a channel of trade — the trade association ISES and its newsletter — that coincided with the channels GEI has used. GBL’s affidavits confirm the importance of ISES as a channel of trade, but counter the claim of confusion by attesting that its affiants understand the differences between the two companies. While GEI’s affidavits demonstrate that its event professionals eventually reached a similar understanding, they also illustrate consumer confusion when entertainment professionals have recommended GEI to clients without being aware of GBL. The presence of both companies on the web is another important common channel of trade, leading some GEI customers to contact GBL in error. However, as demonstrated in Court, the websites themselves contain largely distinct content that is likely to alert the consumer to the services that each company actually provides. These common channels of trade therefore offer some risk of consumer confusion, but afford the means ultimately to distinguish between the companies if the consumer persists and does not look in another direction upon reaching a confusing site.
At the same time, the parties also market through some very separate and distinct channels. No evidence suggests that GBL has advertised on wedding *619 websites or wedding magazines, as GEI does. The college mobile nightclub circuit appears to be a distinct channel of trade, in which GBL predominates. Word of mouth is also likely to be somewhat distinct, reflecting the extent to which the parties offer distinct services to distinct customers. At this point in the proceedings, the most likely inference from GEI’s lack of knowledge of GBL until 2008 or 2010 is that, prior to 2008, GBL used channels that were largely distinct from GEI’s channels. I find that there is a slight to moderate overlap in channels of trade used by the companies generally, but that a more significant overlap has developed in the past two or three years as to those channels used by those seeking wedding, prom and other traditional special event services.
As to prospective purchasers, GBL states that it focuses upon large-scale events on college campuses and other similarly situated institutions and clients. It characterizes its target market as the college-age and young adult crowd. GEI targets a larger age-range that includes but goes beyond GBL’s focus. Again, the moderate overlap of potential customers favors a finding of infringement.
4. Consumer Confusion. Actual confusion exists here. GEI has presented evidence of actual confusion by two named clients, four named industry professionals and the president of ISES. In his affidavit and email, Mr. Dutton himself acknowledges some misdirected calls over the years. Mr. Toto describes calls within the last few months from unnamed clients and potential clients stating that the similarity in names confused them as to which entity they had reached. While that type of generic statement receives little weight, the concrete evidence shows at least some degree of actual consumer confusion. Actual confusion is “the best evidence of likelihood of confusion.” Planned Parenthood, 398 Mass. at 489. See also Operation Able, 646 F. Supp. 2d at 175. The likelihood of consumer confusion also inheres in the use of overlapping names on the internet and in advertising, given that search engines pull up GBL when potential GEI customers search for Groove in Boston. Confusion will likely continue to result in this manner from this ordinary and entirely plausible scenario, given the nature of the internet.
Faced with a prima facie case, GBL tries to prove the negative by offering concrete evidence of a lack of confusion by industry professionals. It also claims that it has redirected potential clients to GEI when those clients had reached GBL in error — although evidently it did not do this for two of GEI’s witnesses (Ms. Driscoll, or Ms. Meuse), raising questions about the consistency of GBL’s supposed redirection policy. The record reflects at least one instance in which Mr. Dutton received an inquiry about a wedding through grooveboston.com and directed the customer not to GEI but to an apparent competitor, Entertainment Specialists. It would be worse than naive to rely upon GBL to refer customers to GEI, with whomithas anactively adversarial relationship. GBL has not fully refuted the evidence of customer confusion.
GBL also cites authority requiring a plaintiff to show “a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.” International Ass ’n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996) (citation omitted). This test does not, however, require a showing of any actual confusion, let alone a minimum quantity of consumers who were actually confused. For instance, in Planned Parenthood, even after discovery and trial, the plaintiff prevailed by showing only three instances of actual confusion, while here there are two instances of consumer confusion and five industry professionals who were confused. See also George Guertin Trophy, Inc. v. Guertin Graphics, Inc., 2007 WL 4248084 at *2 (Mass.Super.Ct., Oct. 11, 2007) (four independent affidavits, two of which expressed confusion). Nor should the actual confusion be discounted simply because the consumers and professionals overcame their initial confusion. The same was true in Planned Parenthood, 398 Mass. at 482, 483. While this case does not involve a highly personal and sensitive context like pregnancy counseling, it does involve a growing potential for additional confusion, epitomized by the breadth of services described in GBL’s service mark application. Correction of initial confusion presupposes persistence by consumers that is not inevitable, given the ease of finding alternatives through word of mouth and on the internet. I find that the similarity of the marks, the logical and expected consequences of the overlap and the confirmatory affidavits showing actual confusion show the requisite likelihood of confusion by an appreciable number of reasonably prudent purchasers in the exercise of ordinary care due to GBL’s use of a mark using the word “groove” in connection with services other than mobile nightclubs.
As for the use of “grooveboston.net,” GBL has not presented evidence of actual consumer confusion, but that may be the consequence of the relative recency of GEI’s domain name acquisition and the fact that GEI has directed it to its own website so that GBL would not easily learn of the confusion. Mr. Toto states that he uses “grooveboston.net” to divert to GEI internet traffic that ordinarily would go to GBL. The likelihood of confusion is obvious whenever a potential customer searches GBL’s correct corporate name. In light of the position it takes on its own motion, GEI cannot seriously refute the likelihood of confusion from the use of “grooveboston.net.” Nor does it attempt to do so. I *620 find that GEI’s use of “grooveboston.net” creates a likelihood of substantial consumer confusion.
5. Intent of the Parties. The parties’ intent is difficult to assess on a paper record but appears to cut both ways. Mr. Dutton adopted “GrooveBoston” in order to differentiate himself from Groove Entertainment and other companies with similar names. At the same time, he was fully aware of Groove Entertainment in the late 1990s or early 2000s, adopted the GrooveBoston name at least two years before he decided to concentrate on mobile nightclubs and did not attempt to avoid a potential conflict with GEI prior to investing his time and capital under the GrooveBoston banner. Whether his intent — and that of Mr. Toto — was legitimate or not depends largely upon whether GEI and GBL had the legal right to the names that each of them uses and has used in connection with the businesses at issue. Using either party’s intent to answer that question would be circular and therefore unhelpful.
The parties’ more recent actions appear calculated to gain leverage, bargaining chips or litigation advantage. These recent actions therefore do little to demonstrate a bona fide intent to use the marks in commerce in the manner asserted. GBL’s application for the service mark claimed use for a broad range of entertainment services and disc jockeys for “special events,” which clearly encompasses GEI’s business operations and goes beyond what GBL represents as its business focus. GEI’s intent in adopting the grooveboston.net web domain was clearly to claim rights in the name that it knew GBL was using, quite possibly as a bargaining chip or leverage. Each party’s intent may have been to claim what it believed rightfully belonged to it, but this form of “self-help” inevitably confuses people.
I find that the intent of the parties factor is neutral in this case, except that it weighs against giving weight to the parties’ post-August 2010 claims and actions (although I do apply the statutoiy presumption that results from registration).
6. Strength of the claimant’s mark. “The strength of a mark is determined by evidence of the length of time the mark has been used, its renown in the plaintiffs field of business,... the plaintiffs actions to promote the mark" and its “placement on the spectrum of distinctiveness.” Operation Able, 646 F.Sup.2d at 176, quoting Star Fin. Servs., Inc. v. AASTAR Mortgage Corp., 89 F.3d 5, 11 (1st Cir. 1996). Neither party has registered “groove" with the Massachusetts Secretary of State. Registration of the other two marks constitutes prima facie evidence of GEI’s “exclusive right to use” “Groove Entertainment” and GBL’s exclusive right to use “GrooveBoston.” G.L.c. 110H, §5(b). That same section allows both parties to “prov[e] any legal or equitable defense or defect which might have been asserted if the mark had not been registered.” Id. In this case, I find that neither party has rebutted the other’s statutory prima facie case.
Here, GEI has been promoting “Groove” and “Groove Entertainment” continuously for fifteen years to the present and has received recognition within the event services industry, from referral sources, in wedding publications and among its customers. While not household names, these words thus have achieved some local renown in the plaintiffs field of business. They rank in the middle of the spectrum of distinctiveness but squarely within the inherently distinctive range. As used by GEI, they are moderately strong marks.
The same cannot be said of “Groove Boston” when used by GEI. Most of the industry professionals submitting affidavits did not associate this phrase with GEI, nor does it appear in any current materials on GEI’s website. GEI’s use of the phrase diminished in the mid-2000s and its order of a dozen shirts in 2008 hardly established a strong mark at that time (and may not ultimately save the mark from abandonment, as discussed below). For at least eight years it did not even discover GBL’s use of this mark, which seems implausible if GEI was actively using it. If GEI retains any rights at all in “Groove Boston,” its mark is exceedingly weak.
As used by GBL for mobile clubs, the mark “Groove-Boston” has been in use for at least eight and possibly ten years. It has achieved recognition among other event service providers and customers such as colleges. It has actively marketed its services to its customers under this name for nearly a decade. For the mobile club market, GBL’s “GrooveBoston” mark is moderately strong. It has achieved virtually no recognition and made virtually no investment in that mark in the area of weddings, proms, corporate events and GEI’s other core services.
7.Conclusion on Likelihood of Confusion. Almost all of the factors weigh in favor of finding a likelihood of confusion in GBL’s use of the term “GrooveBoston” and other iterations of the same words only in the area of overlapping services. I find that GEI has a likelihood of success of proving trademark infringement in that area. Outside that area, the factors all weigh against such a finding, particularly given the nature of the parties’ services.
On the cross motion, GBL has established a prima facie exclusive right to use the mark “Groove-Boston” on goods or services specified in the registration. G.L.c. 110H, §5(b). It is likely to succeed on its claim to exclusive use of this mark in the mobile nightclub business, but, for reasons just stated, not as to weddings, proms, corporate events, bar/bat mitzvahs and the like. GEI’s decision to acquire and use “grooveboston.net” is also likely to cause confusion, given the extreme similarity of marks notwithstanding large areas where the parties do not compete.
*621 C. Abandonment
GBL also argues that GEI has abandoned the name “Groove Boston.” It has the burden of proving abandonment, which can be done by showing nonuse for two consecutive years (which establishes a prima facie case of abandonment), discontinuance of use with no intent to resume the use or any course of conduct by the owner that causes the mark to lose its significance. G.L.c. 110H, §1. See also 15 U.S.C. §1127 (three-year nonuse period). In light of the findings above, this issue requires only brief comment.
The premise of GBL’s abandonment argument is a factual assumption, rejected above, that GEI ceased use of the Groove Boston mark before 2001. In fact, there is documentary evidence of significant use from 1996 through the mid-2000s. Nevertheless, GBL appears to have a viable abandonment argument regarding “Groove Boston.”
My findings regarding GEI’s website, invoices and affidavits show its nonuse of “Groove Boston” in commerce currently and since the mid-2000s. My findings, made on issues as to which GEI had the burden of proof, apply to this issue as well, on which GBL has the burden. At this stage, it appears from the impartial affiants and the documents that GEI has been using “Groove” and “Groove Entertainment” — but not “Groove Boston” — in recent years until its apparently retaliatory use in 2010 of grooveboston.net. That period exceeds two (and even three) years. The unexplained purchase of a dozen T-shirts in 2008 is unlikely to show meaningful actual use of Groove Boston in commerce after 2006. While the issue is close and certainly will benefit from further factual development, GBL has shown a likelihood of success on its defense that GEI abandoned any mark in Groove Boston.
II. BALANCE OF HARMS
Section 13 of G.L.c. 110H provides:
Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
This section makes reputational injury or dilution sufficient conditions for injunctive relief without mandating any particular form of injunction. Of particular significance to the treatment of “grooveboston.net,” the statute allows an injunction even though GEI does not compete in the mobile nightclub market. See The Great Scott Food Market, 348 Mass. at 324-25 (construing former G.L.c. 110, §7A, predecessor to G.L.c. 11 OB, §12 and G.L.c. 110H, §13).
I find that GBL’s use of a name including the word “groove” outside the mobile nightclub market injures GEI’s reputation among its customers and referral sources, dilutes the distinctive quality of its registered mark in “Groove Entertainment” and its common-law mark in “groove.” Indeed, at least two affidavits reflect confusion when a recommendation for GEI was understood as applying to GBL. Likewise, GEI’s use of “grooveboston.net” diverts internet traffic intended for GBL (as it was intended to do) and dilutes the distinctiveness of GBL’s registered mark in “GrooveBoston” even though GEI does not compete in the mobile nightclub business.
Neither party will suffer significant harm from an injunction that prohibits it from using the other’s mark in the area of overlap or, in GEI’s case, from using grooveboston.net. Each company may continue to engage in its core business using its familiar trade names. The relatively minor harms caused by GBL’s inability to use “groove” to compete in GEI’s core business or by GEI’s inability to use a web domain consisting of GBL’s longstanding corporate and trade name are easily outweighed by the harm that would result from failing to enter the preliminaiy injunction.
III. SCOPE OF RELIEF
Each party has requested an absolute injunction against use of its mark by the other. However, a qualified injunction may be appropriate to “achieve a more equitable balance between the interests of the plaintiff and the defendant” where the defendant demonstrates a legitimate interest in continued use of a designation. See George Guertin Trophy, 2007 WL 4248084 at *3 n.3; Restatement (Third) of Unfair Competition §35 comment d at 364. That is the case here — the parties have a legitimate interest in continued use of their own names, which are registered marks. For the reasons stated above, GEI also has a legitimate interest in the word “groove” as applied to weddings, bar/bat mitzvahs, proms and corporate events.
I have considered the factors set forth in the Restatement (Third) of Unfair Competition, §35(2). To the extent ascertainable at this early stage, I find that each party has a significant investment and reputation in its respective marks; that neither engaged in wrongful conduct until after they identified the problem with the overlap in the summer of 2010 (after which each did act aggressively to claim the other’s turf); the legitimate interests of both the plaintiff and the defendant in continuing to be known by their respective marks would be harmed in the absence of injunctive relief; the public would increasingly be confused and harmed without an injunction; GEI’s delay in asserting its rights was not unreasonable given the differences in services and in the absence of proof that it was aware of GBL in 2008 or 2010; any misconduct of the parties is limited to the post-August 2010 period; and, while a qualified injunction involves some challenges, it is *622 practical to frame and enforce apr eliminary inj unction that will restore to each party theuse and effectiveness of its mark in its area of business. Whatever practical difficulties a qualified injunction may present are outweighed by the preliminary nature of the relief, the possibility offurthermodification or adjustmentpend-ing a decision on the merits, and the harm that would result from an absolute injunction based upon an abbreviated record, which would effectivelyhaltGBL’s legitimate business efforts and have the effect of final relief.
IV. ORDER
Upon consideration of the foregoing, the parties’ arguments and the record, the plaintiffs application for preliminary injunction is ALLOWED IN PART AND DENIED IN PART. The defendant’s motion for preliminary injunction is ALLOWED. It is hereby ORDERED that:
1. Defendant, GrooveBoston, LLC, its officers, employees, agents and persons acting in concert with it are preliminarily enjoined from using the words “groove,” “GrooveBoston” or any similar word, phrase, logo or symbol including the word “groove” in connection with provision of event production services for weddings, proms, bar/bat mitzvahs, holiday parties (other than mobile night clubs) or corporate events within Massachusetts. Without limitation, its website, promotional materials and oral presentations shall not represent in any way that GrooveBoston does any kind of weddings, proms, bar/bat mitzvahs, holiday parties (other than mobile night clubs) or corporate events. Nothing in this paragraph shall prevent the defendant from using a different trade name, not including the word “groove,” to provide such event services.
2. Plaintiff, Groove Entertainment, Inc., its officers, employees, agents and persons acting in concert with it are preliminarily enjoined from using the web domain “grooveboston.net” and from advertising and/or promoting itself using the words “Groove Boston” or any other iteration of the words “groove” and “Boston.”
3. The parties shall make their best efforts to comply with paragraphs 1 and 2 as soon as commercially feasible and in no event shall either one of them comply later than February 15, 2011.
4. GEI’s application for preliminary relief against GBL’s use of the mark “GrooveBoston” is denied.
5. If either party desires expedited consideration of the merits of this action, it shall serve a motion for expedition on or before February 3, 2011.

 The Court has intentionally adopted neutral abbreviations for each party. The parties describe themselves by the very names at issue in this case.

 The same invoice reflects purchase of2,500 postcards for weddings and 1,000 postcards for “Bar/Bat Mitzvah,” suggesting different marketing approaches for different target markets.

 These items (like the “2-color labels” ordered on 7/23/03) may well have contained a Groove Boston logo, but the Court draws no such conclusion, as there is no affirmative evidence either way on that point.

 The four professionals are Salvatore DeGeorge (director of catering sales at the Taj Hotel in Boston), Jennifer Gullins (special events and event planning employee at Saphire Events Group), Patrick Lockaby-Cotter (hospitality consultant in the events production industry and immediate past president of the New England Chapter of the National Association of Catering Executives), and Trang Spratt (senior catering sales manager for the Royal Sonesta Hotel in Cambridge, Massachusetts). Larry Green, president of the International Special Events Society (“ISES”) also falls in this category and presented an affidavit.

 In ruling on a motion for preliminary injunctive relief, the Court may consider evidence that would be inadmissible at trial See Planned Parenthood, Inc. v. Operation Rescue, Inc., 406 Mass. 701, 711 n,9 (1990). The hearsay nature of the evidence potentially goes to weight.

 While the Court discussed with the parties whether they had any objection to the Court taking a “virtual view” by looking at their websites, the Court has not done so, in light of the printouts contained in the materials and the in-court demonstration of those websites during the hearing on the preliminary injunction.

 Affidavit of Becky Riopel, Director of Student Programs & Involvement, College of the Holy Cross, Worcester, Massachusetts.

 Affidavits of Rosemary Fischer, President and Creative Director, Bravo Productions, Inc., Nashua, New Hampshire: Steve Way, owner of Advanced Lighting & Production services: Clayton Young, manager, Capron Lighting and Sound.

 GEI asserts that some of these businesses were dissolved or are in different markets, such as securities trading. While the name of at least one of the companies suggests participation in a different market, I do not rely upon GEI’s representations, made without documentation or affidavit. See Superior Court Rule 9A(a)(4).

 The record contains no evidence of media usage of “groove.” GEI’s merit was recognized by at least one third-party website, but there is no proof that the website referred to it as “groove.”

 Indeed, the Supreme Judicial Court’s formulation is identical to factors (1), (2), (3), (5), (6) and (8) of the Plgnons test. Planned Parenthood, 398 Mass. at 488, also considered factor (7), as it noted the defendant’s intent to confuse women looking for Planned Parenthood, so that Problem Pregnancy could deliver a contrary message. The one additional factor cited in Planned Parenthood, 398 Mass. at 486 — length of use of the mark — is subsumed in the discussion of strength of the mark under Pigrtons and, in any event, weighs in favor of relief here, given GEI’s fifteen-year use of Groove and Groove Entertainment, as well as GBL’s eight-to ten-year use of GrooveBoston.

 GBL’s memorandum claims that Mr. Toto and Mr. Dutton became acquainted through ISES in or about 2008, but Mr. Dutton’s affidavit does not confirm that timing. GBL does not contend that Mr. Toto became aware of Mr. Dutton’s use of the name GrooveBoston before 2010.

 The Court discusses these three factors together, as is typical. See Rise Club, Inc. v. Gerber Group Limited Partnership, 26 Mass. L. Rptr. 571, 573 (Mass.Super.Ct. April 12, 2010).